Argued September 14, affirmed November 17, 1971

BRANDT, *Respondent, v.* PREMIER INSURANCE
CO., *Appellant.*

490 P2d 984

*Gerald R. Pullen,* Portland, argued the cause for appellant. With him on the brief was Theodore Lachman, Portland.

*Charles Elliott,* Portland, argued the cause for r e s p o n d e n t. On the brief were Elliott & Davis, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, TONGUE, HOWELL, and BRYSON, Justices.

BRYSON, J.

This is an action to recover damages under the terms of an insurance policy. Plaintiff, the owner of a 27' Owens cabin cruiser, insured his boat with defendant under the terms of a "watercraft policy" which provided, in part, as follows:

> "PERILS INSURED: The perils insured against hereunder are all risks of direct physical loss or damage *from any external cause,* * * * that have come or shall come to the hurt, detriment or damage of said watercraft * * *." (Emphasis supplied.)

The boat was normally moored at McCuddy's Marina, Portland. The plaintiff took the boat to the mouth of the Columbia River for salmon fishing and

obtained moorage at Hendrickson's marina on the Skipanon River near its confluence with the Columbia River, just west of Astoria, Oregon. The boat was berthed port side to a walkway constructed by fastening long, heavy planks on top of two or more boom logs. Old automobile tires were fastened to the walkway to act as bumpers between the boat and dock, but the plaintiff testified they were not spaced properly to provide protection for the boat hull. The boat was open to traffic on the starboard side. The plaintiff invited two guests to go fishing on August 23, 1969. He spent the night of August 22 on board the vessel. The two guests arrived at 5:00 A.M. and put their fishing tackle on board. There was a heavy fog impairing navigation. The three men went to the nearby marina restaurant and tackle shop to wait for the fog to clear. They returned to the boat in "about an hour and found the boat was sinking." It was low in the water by the stern. The plaintiff and guest, Kenneth Van Dyke, testified that the boat was on an even keel and there was no evidence that the boat was taking on water when they left for the restaurant. Plaintiff testified that the boat was seaworthy in all respects prior to this incident. There was evidence that the boat had been struck on the starboard side near the transom while they were absent from the boat. Witness Van Dyke testified that the water was up to the floor board in the stern of the boat; that the boat was partially pumped out by the use of a portable pump on the dock. When they could get on board, they finished pumping the bilge with the boat's own pump. He then lifted the floor boards and could see "water was seeping in that corner." Plaintiff testified, "* * * you could see the water seeping through from the port side, so then they discovered this crack on the out-

side." Temporary calking was applied by a mechanic at Hendrickson's marina. The plaintiff telephoned the defendant's office and reported the incident and was told it would be two weeks before they could get an adjuster to Warrenton. Although "the boat kept leaking a little bit," the plaintiff returned the boat to Mc-Cuddy's Marina in Portland and arranged for Mc-Cuddy's to watch the boat and to keep it pumped out by the use of their auxiliary bilge pump until the boat could be dry-docked for permanent repairs.

On October 6, 1969, Mr. Durham, an adjuster for defendant, was on board the boat while it was being pumped out by an employee of McCuddy's Marina through the use of the boat's own bilge pump. He noticed that the marina's bilge pump was inoperable, that the "seepage was, although considerable, not beyond control," and that the boat prior to pumping "* * * had [a] port list to it * * *." Three days later the boat sank.

The plaintiff brought action against defendant for damage to the boat in the sum of $4,807.86. The case was tried to the court and judgment was entered in favor of the plaintiff in the amount of $3,541.36, together with attorney fees.

The defendant assigns as error (1) the court's denial of defendant's motion for involuntary nonsuit; (2) the finding that an external force caused damage to plaintiff's boat; and (3) that plaintiff's proof entitled him to recover judgment for such damage.

The defendant argues that "there was no substantial evidence that another vessel collided with plaintiff's vessel." In other words, it is contended that there was no substantial evidence of damage *from any external cause.*

In addition to the facts already set forth, there was evidence that the boat had been struck on the starboard side, thus forcing it against the dock on the port side, cracking one of the boat's planks. Both plaintiff and the fishing guest, Van Dyke, testified that the metal moulding protecting the butt ends of the planks at the starboard stern had been torn loose and that the swimming platform, attached to the transom, was damaged on the starboard side. Plaintiff also testified that when the boat was in dry dock at Warrenton for temporary repair, he observed the following:

"A [Mr. Brandt] We had different colored paint and kind of a marred deal on the starboard side, just about center midship, I would say.

"Q What color was it?
"A Kind of an orange and blue marking. Kind of scraping.

"Q Kind of scraping?
"A To me, it looked like it hit head-on. Whether the side of the boat or stern part, I don't know, but the markings was there.

"Q Where was it, on the starboard side above the water line?
"A Yes."

On cross-examination plaintiff was asked:

"Q Did anyone, to your knowledge, report to the marina that they had struck your vessel?
"A There was a party that come into the tackle shop and told Clyde Dare that somebody hit the boat."

The answer was objectionable, but there was no motion to strike the answer given.

At the conclusion of argument, the trial court stated:

"I am convinced that the plaintiff has proven that there was an external force that caused this damage, within the meaning of the policy. * * * I am convinced that the boat was seaworthy. I think the evidence so establishes * * *."

There was also the general findings, to this effect, set forth in the judgment order.

■■ We conclude there was substantial evidence to support the trial court's finding that the boat was damaged from an *external force,* which is the peril insured against. In a law action, the court's findings have the force and effect of a jury verdict and must be affirmed if supported by any substantial evidence. *Cornelison v. Seabold,* 254 Or 401, 407, 460 P2d 1009 (1969); *Fabre v. Halvorson,* 250 Or 238, 239, 441 P2d 640 (1968).

As noted, the court granted judgment in the amount of $3,541.36. The defendant argues that a portion of the damages allowed were not the result of the boat being struck at Warrenton, Oregon, but were in fact the result of the boat sinking sometime later at McCuddy's Marina at Portland, Oregon.

A review of the evidence discloses that no one could determine with certainty the cause of the boat sinking at its berth at McCuddy's Marina. There is no evidence that the boat was again damaged *from an external cause,* such as a floating log or another vessel. The plaintiff knew that the boat was still leaking after the temporary repairs to the hull at Warrenton and knew that it was still taking on water when he completed his return run up the Columbia River to McCuddy's Marina. No dry dock facilities were avail-

able to lift the boat immediately, and he then arranged with McCuddy's to watch the boat and keep it bilged out. Three exhibits, invoices from McCuddy's Marina, were received which read:

"* * * pump bilge water from bilge of Owens cruiser on Oct. 1, 1969 at 2:00 P.M. * * * on 10-2-69 @ 2:30 P.M. * * * 10-3-69 * * *,"

for a total charge of $14. As previously related, on October 6, 1969, Mr. Durham, an adjuster for defendant, was on board the boat while it was being pumped out by an employee of McCuddy's Marina. He noticed that the marina's bilge pump was inoperable and testified that the "seepage was, although considerable, not beyond control." Edward E. Hargrave was engaged by Mr. Durham, of the defendant company, to raise the boat and pump it out and, if possible, to take it to the dry dock operated by Toby's Marine Service, as the boat was a potential hazard to navigation. Mr. Hargrave had thirty years' experience in different businesses and operations pertaining to boats, including the boat repair business, salvage business, construction of boat houses, and the operation of tug boats. He testified:

"* * * In this case, we were unable to find any leak in the back end of the boat. It was a puzzle because we couldn't find out what made it sink.

"Q Did you find any leakage on the starboard side of the vessel?

"A We didn't find any leakage anywhere * * *"

He further testified that after the boat was raised and pumped out "I could not observe any major increase in the water level in the bilge, so it did not seem to me to present any danger of just sinking on us

while we towed it the comparatively short distance we had to tow it * * *." As an expert witness he testified as follows:

"Q [Defendant's counsel] I see. Now, Mr. Hargrave, when you have a vessel that takes water over a period of time, and it starts to set lower in the water, do you sometimes have a vessel that will sink by reason of merely it setting lower in the water than normal?

"A Oh, yes, you raise the point of your hydrostatic pressure, and the weight of the vessel pushes it down in the water and, as it picks up more water, the hull itself proceeds to get down into water that previously was not immersed, and those planks will be drier, the seams will be dry, and it's quite possible that you could have water forced in at places which would not show when you had it pumped out, so, therefore, as it got part-way down, it would then finish the trip a lot faster. Its rate of descent would increase progressively."

These facts, taken from an examination of the entire record, disclose the most probable cause of the boat sinking at McCuddy's and bring us to the most difficult question raised on the appeal: Is the defendant liable to plaintiff under the terms of the insurance policy for those damages which occurred when the boat sank at McCuddy's Marina? Or, stated another way, was the striking of plaintiff's boat by another vessel at Warrenton, Oregon, the proximate cause of the loss which occurred by reason of the boat sinking?

"Generally. In cases of marine insurance, the proximate cause is the last event in time preceding and directly producing the damage except in those cases where the efficient cause, while not last in time, is of such an overpowering and irresistible nature that its course and predictable results cannot be materially affected by subsequent inter-

vening acts or events." 18 Couch on Insurance 2d, § 74:763.

In *Lanasa Fruit Co. v. Insurance Co.,* 302 US 556, 563, 58 S Ct 371, 82 L ed 422 (1938), the court, in discussing *Leyland Shipping Co. v. Norwich Union Fire Insurance Society,* (1918) A. C. 350, stated:

> "There, in a policy insuring a ship, there was a warranty of exception in case of hostilities or warlike operations, and the question was whether the loss of the vessel fell within the exception. The vessel was torpedoed and sustained severe injuries but succeeded in making the outer harbor of the port of Havre. Notwithstanding all efforts by pumping and otherwise, she bumped, broke her back, and sank. It was contended that she perished by a peril of the sea because sea water entered the gash in her side which the torpedo made. The entry of the sea water was indeed a peril of the sea and was proximate in time to the sinking. But as 'proximate cause is an expression referring to the efficiency as an operating factor upon the result' it was held that 'the real efficient cause' of the sinking of the vessel was that she was torpedoed and hence that the loss was within the exception."

The evidence in this case indicates that the striking of plaintiff's boat by another vessel at Warrenton, Oregon, was not the real efficient cause. As stated in *Couch, supra,* it was not "of such an overpowering and irresistible nature that its course and predictable results" could not be materially affected by the subsequent intervening act or event of the boat sinking by taking on water at McCuddy's Marina.

■ Accordingly, we find that the proximate cause of the sinking of the boat was not from the *external cause* which occurred at Warrenton, Oregon. Therefore, the defendant would not be liable for those dam-

ages which occurred from the sinking of the boat on August 23, 1969.

The plaintiff's boat was repaired at Toby's Marine Service, operated by Mr. Strassburg. Mr. Strassburg was called as a witness to testify regarding damages the boat had sustained. Repairs had not been completed at the time of trial. He submitted a written estimate on repair. This was marked and received as one of plaintiff's exhibits. This exhibit enumerated specific repairs and reasonable charges made. The trial court correctly disallowed most of the items but erroneously included the items "Disassemble Engs. Clean & Reassemble $1,438," and "Hauling Engs $36." There is no evidence that this damage occurred as a result of the original striking of the boat at Warrenton, Oregon. Mr. Strassburg testified that he dry-docked the boat and made repairs to the hull. He testified that he found cracked ribs and a split plank on the port side of the boat. He also testified that he could tell that the damage was of recent origin by the discoloration of those portions which were removed and that this damage would not result from normal wear and tear. The written estimate from his company has one item, "refinish and repair the hull damage, $1,700," which the trial court found was the result of the original incident at Warrenton, Oregon. We agree with this finding. There is no evidence that the hull was damaged at the time of sinking.

The evidence does disclose that temporary repairs were made by Hendrickson's marina at Warrenton, Oregon, in the amount of $147.50; that repairs were made to the transmission and reverse gear, necessitated by the submersion of this part of the boat while at Warrenton, Oregon, in the amount of $135.86;

that the boat required pumping by McCuddy's Marina by reason of the incident at Warrenton, Oregon. These charges are $14.00.

The defendant argues that the aforesaid exhibits received, together with the testimony of Mr. Strassburg, do not meet the requirement for the proof of damages. He relies on *Hansen v. Oregon-Wash. R. & N. Co.*, 97 Or 190, 201, 188 P 963, 191 P 655 (1920) for the proposition "stated broadly, the measure of damages for an injury to personal property is generally the difference between its value at the place immediately before and immediately after the injury." It is further contended that "[w]hile McCormick [on Damages, Hornbook Series, page 471-472] refers to repairs as a possible measure of damages, the Oregon Court has directly refused to follow this formula, * * *." Relying on *Hansen, supra*; *Lee Tung v. Burkhart*, 59 Or 194, 205, 116 P 1066 (1911); *Longbotham v. Takeoka et al*, 115 Or 608, 239 P 105 (1925).

In the recent case of *Growers Refrig. Co. v. Amer. Mtr. Ins.*, 260 Or 207, 488 P2d 1358, 1364 (1971), this court stated:

"We have previously recognized that '* * * since the allowance of damages is to award just compensation without enrichment, there is no universal test for determining the value of property injured or destroyed and that the mode and amount of proof must be adapted to the facts of each case.' *Oregon Mutual Fire Ins. Co. v. Mathis*, 215 Or 218, 224-25, 334 P2d 186 (1959). Thus, we have held that in the case of partial damage to property in which the measure of recovery is the amount of decrease in value of the property, the cost of making repairs may be admissible and often may be the only practical means of determining the loss suffered. *In Re Stout's Estate*, 151 Or 411, 423-24,

50 P2d 768 (1935). See also *Oregon Mutual Fire Ins. Co. v. Mathis, supra,* at 225. Accordingly, we held in *Murphy v. Hawthorne,* 117 Or 319, 327, 244 P 79 (1926), that while proof of 'before and after' value of a damaged automobile may be preferable, '\* \* \* presumptively, at least, the difference in its value before and after it was injured would be the amount that it would cost to repair it and restore it to its former condition \* \* \*.' "

It would be preferable for plaintiff in this case to offer testimony showing the difference in the cash, or market, value of the boat on the "before and after" basis. Nevertheless, the difference in the boat's value before and after it was damaged would be the amount that it would cost to repair and restore it to its former condition. This evidence was admissible and was received by the court, and it was on this basis that the damages were allowed. Accordingly, we conclude that there was sufficient evidence to support the court's findings and verdict as to damages in these amounts. Because the court did consider and allow damages which could only have occurred by reason of the sinking of the boat and not by reason of it having been struck, the verdict must be modified by deducting therefrom the amount of $1,438 for disassembling the engines and cleaning and reassembling the engines, and the sum of $36 for hauling the engines.

In accordance with the above opinion, the judgment is modified and the case is remanded to the trial court to enter judgment in favor of plaintiff and against defendant in the amount of $1,996.36, together with attorney fees and costs and disbursements in the lower court. Defendants are entitled to costs on this appeal. *See Pearson v. Schmitt,* 259 Or 439, 487 P2d 84 (1971).